(116 App. Div. 758)

### KELLY v. WILLS.

(Supreme Court, Appellate Division, Second Department. January 18, 1907.)

1. DEATH—ACTION—CAUSE OF DEATH—EVIDENCE.

 Evidence in an action to recover for the death of a servant considered, and *held* sufficient to prove that the accident complained of was the proximate cause of death.

 [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, § 94.]

2. SAME—TRIAL—QUESTIONS FOR JURY—CAUSE OF DEATH.

 In an action to recover for the death of a servant, the question as to the cause of the death is for the jury, and they are not required to find that

cause beyond a reasonable doubt, nor to find the specific affliction of which he died with the certainty of a medical determination, and they are not bound to base their verdict on the medical testimony.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, § 141; vol. 20, Evidence, §§ 2395, 2446.]

3. EVIDENCE—OPINIONS—EXAMINATION OF EXPERTS—ASSUMPTIONS.

In an action to recover for the death of a servant, the physician who attended him testified that he died of embolism. *Held* that, in questioning experts as to the cause of death, it might be assumed that death was caused by embolism.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 2366, 2367, 2371.]

Appeal from Trial Term, Westchester County.

Action by Catherine Kelly, as administratrix of the estate of John Kelly, against Charles T. Wills. Judgment for plaintiff, and defendant appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, RICH, and MILLER, JJ.

Robert Thorne (Frank V. Johnson, on the brief), for appellant.
Arthur J. Burns, for respondent.

JENKS, J. The action is for negligence by the administrator of a servant against the master, and the master appeals from a judgment on the verdict.

The appellant contends that there is neither proof of his negligence, nor of the absence of the intestate's contributory negligence. The servant, standing upon a scaffold at work on a building, fell to the ground and was injured when the scaffold gave way. I think that there was sufficient evidence of the defendant's negligence to sustain the verdict. We so held in Stach v. Wills, 101 N. Y. Supp. 1145, an action arising out of the same accident, decided November 28, 1906, and the testimony is much the same as in that case. The question of contributory negligence was for the jury.

The appellant also contends that there is total failure of proof that the accident was the proximate cause of death, and hence the question arises whether the evidence is sufficient to justify the finding of the jury to that effect. The accident occurred on March 21, 1904. The intestate fell 15 or 20 feet, and there is evidence that building stones and mortar tubs fell in upon him. He was taken to a hospital at once, and examination showed that his left leg was broken in two places, his right ankle was partially fractured and dislocated, and he was bruised about the body, especially on the left side thereof. He remained in the hospital until April 16, 1904, when he suddenly died. There was much expert medical testimony. The criticism of the appellant is that the case presents a double uncertainty, a guess upon a guess, first, as to whether the death was due to the embolism, and, second, whether the injuries caused the embolism. Dr. Hasbrouck had charge of the case in the course of his regular attendance at the hospital, beginning about April 1st. He testifies to the injuries which I have described, that the patient suffered from shock and pain, and that the bruises were severe in character. He testifies:

"I know what he died of—embolism; that is, a fibrinous concretion or a blood clot, that might get plugged in the valve of the heart or anywhere in the circulation."

This witness is criticised for two reasons. It is said, first, that he is impeached by his own previous statements and by his qualifications of his testimony; and, second, by the testimony of other physicians. It appears that the witness made the statement of the cause of death, in the hospital records and in the death certificate, that the probable cause of death was "heart failure, cardiac polypus"; meaning thereby, he says, that there was a growth in the interior of the heart which reached the valve of the heart. It also appears that there was no autopsy or examination of the heart made after death, and the witness testifies that he thinks there should have been, to determine what the cause of death was, and that, if such examination had taken place, it might have been found that the original judgment of the cause of death was correct. The other physicians called testify, with one exception, as to the necessity of an autopsy. Dr. O'Hanlon, for the defendant, a physician of great experience in ascertaining the cause of death, who had made 5,000 autopsies, in answer to a hypothetical question, said that in his opinion the cause of death could not be told, but that it was a mere matter of conjecture, without an autopsy. Dr. Benedict, for the defendant, answered that upon the hospital record and the hypothesis he did not know the cause of death, and that in the absence of an autopsy it was not possible to assign the cause of death with reasonable certainty. Dr. Banning, for the defendant, in answer to a hypothetical question, said that there could not be a causal connection, and testified that, to ascertain "the exact cause of this heart difficulty, causing death, an autopsy was necessary." Dr. Schmidt, for the defendant, testified that without an autopsy it was "impossible to determine the question or matter with any reasonable certainty." Dr. Denniston, for the plaintiff, the first physician in actual attendance on the patient from his entry into the hospital until April 1st, testified that "an autopsy would have to be held to determine exactly what the situation was." Dr. Fleming, for the plaintiff, does not agree that an autopsy was necessary to determine "the real and correct cause of death." Dr. Foy testified that, if there had been an autopsy conducted, "you might have ascertained exactly and definitely the cause of death."

If it was the duty of the jury to determine the exact and definite cause of death with the scientific certainty of a physician, and if the jury were to decide that question solely upon the medical testimony, it is quite true that the question was in much doubt. But the question of cause was for the jury, who were neither required to find that cause beyond a reasonable doubt, nor to find the specific affliction of the heart with the certainty of medical determination, who were not bound to base their verdict upon the medical testimony, and who were at liberty to disregard the opinions of the experts called by either side. Lawson on Expert Evidence, 177, and cases cited. See, too, Roberts v. N. Y. El. R. R. Co., 128 N. Y. 457, 28 N. E. 486, 13 L. R. A. 499.

What, then, was the evidence before the jury? There was evidence that the decedent, a man of 52, was a workingman, well and

in good health; that he fell 15 or 20 feet to the ground, and that
stone and mortar tubs fell in on him; that his left leg was broken
above the knee, that his left ankle was broken, and that his right
ankle was partially fractured or dislocated and broken; that he was
badly bruised, especially his left side, and shoulder; that he suf-
fered from much shock and much pain, which pain continued as
long as he was under his first physician, until April 1st, and he suffered
from shock and pain in the judgment of the succeeding physician in
charge; that such physician could not find any other cause of death
save the injuries; that in his final opinion the cause of death was em-
bolism of the heart, a fibrinous concretion or a blood clot, that plugged
up the valve in the heart; that in his opinion the injuries were an ad-
equate cause; that when the patient entered the hospital his heart was
examined, and then there was no trouble with it; that embolism, which
is a thickening of the fiber of the blood, could arise anywhere in the
circulation and could be carried to the heart; that it could be caused by
the lying quiet in bed for five or six weeks, and that another cause is
the weakened condition of the blood vessels produced by strain, and
that there were embolisms caused by fractures; that a blood clot forms
and gets into the circulation; that in the case of an artery that has
been injured, in healing a blood clot forms, and that blood clot after a
little becomes dislodged and gets in the circulation and plugs it;
that that is an embolism; that, while there could be a growth of the
heart which would be fatal (cardiac polypus), the original examining
physician would have discovered it; and that he did not find it. And
then the jury had also the evidence of several physicians that the
injury was an adequate cause. Upon this evidence, and in the absence
of proof of any intervening efficient cause, I think that there was
sufficient evidence to sustain the verdict, which was that the injury
was the cause of the death. They may have rejected the testimony of
the defendant's experts, or they may have concluded that it was very
true, from their testimony and that of the other physicians, that an
autopsy was the only certain method of determining the exact cause
of death; but they were not bound to be certain, or to establish a cer-
tain medical opinion, of the exact cause of the death.

In Seifter v. Brooklyn Heights R. R. Co., 169 N. Y. 254, 62 N. E.
349, cited by the learned counsel for the appellant, the decision turned
upon a septic condition at the point of fracture, and therefore it was
necessary for the plaintiff to offer evidence to establish infection at
the point of fracture; whereas, the sole physician who treated Seifter,
and who alone had made an examination after the cast was removed,
testified that there was no evidence of degeneration or of septic con-
dition (page 260 of 169 N. Y., page 350 of 62 N. E.). This was the
crucial point, and the plaintiff failed in it. But in this case there was
the testimony of the expert that death was due to embolism of the
heart; that the embolism might be caused by a weakened condition of
the blood vessels produced by strain, or by a person lying quiet in bed
for five or six weeks; and also that there are embolisms caused by
fractures, so that a blood clot forms and gets in the circulation—when
an artery has been injured, the clot forms in the healing, is dislodged,

and gets into the circulation, and when the heart is affected death follows at once. In other words, the expert evidence is that, as the result of such an accident as was testified to in this case, an embolism could have existed.

It is true, of course, as suggested by the learned counsel for the appellant, that the questions put to the experts, outside of the physician who attended the patient, assumed that the patient died of embolism; but these questions were to elicit the opinion whether the injury was the proximate cause, and the assumption was justified in view of the testimony of Dr. Hasbrouck. There is no merit in the criticism that the court permitted the question to Dr. Hasbrouck which assumed that he found embolism, for the reason that the witness testified that he knew the patient died of embolism. The only objection was that the question was "incompetent," without comment or explanation.

I advise that the judgment be affirmed, with costs. All concur.